MICRO-MANAGERS, INC., a Wisconsin Corporation, Plaintiff-Respondent,

v.

Stanley Oren GREGORY, Defendant-Appellant,

Terry COLEMAN, Defendant.

Court of Appeals

*No. 87–1506. Submitted on briefs August 2, 1988.—Decided November 10, 1988.*

(Also reported in 434 N.W.2d 97.)

500

502

For the defendant-appellant the cause was submitted on the brief of *Bruce Gillman* and *Tomlinson, Gillman & Travers, S.C.,* of Madison.

For the plaintiff-respondent the cause was submitted on the brief of *Nicholas J. Seay* and *Kenneth B. Axe,* and *Isaksen, Lathrop, Esch, Hart & Clark* of Madison.

Before Dykman, Eich and Sundby, JJ.

DYKMAN, J.   Stanley Gregory d/b/a Consulting Engineers appeals from a judgment requiring him to pay Micro-Managers, Inc., (MMI) $24,503.68. MMI had sued Gregory for breach of contract after Gregory refused to pay for a computer program he had contracted for and had thereafter sold to a third party. The issues are: (1) whether the contract was a transaction for goods, and thus subject to the Uniform

Commercial Code (U.C.C.); (2) whether there was an implied warranty from MMI to Gregory; (3) whether MMI substantially performed the contract; and (4) whether the trial court abused its discretion in denying Gregory's motion to amend his counterclaim. We conclude that: (1) the contract was mainly for services, and that therefore the U.C.C. does not apply; (2) there was no implied warranty; (3) MMI substantially performed the contract; and (4) the trial court did not abuse its discretion by denying Gregory's motion to amend his counterclaim. Therefore we affirm.

## FACTS

In the fall of 1982, Oilgear, an industrial manufacturing company in Milwaukee, contracted with Gregory to develop a new programmable controller to replace equipment which Oilgear was using. Gregory contacted Rex Peterson, general manager of MMI, who indicated MMI was interested in designing and developing the software required for the controller. Gregory's technical coordinator, Terry Coleman, met with his counterpart at MMI, Mike Christie, to find out whether MMI had the personnel and expertise to design and develop the required software in accordance with Oilgear's specifications. After MMI had prepared certain cost estimates, Gregory told MMI to go ahead with the design and development of the controller software. MMI began work on the project on October 7, 1982.

On October 22, 1982, MMI drafted a letter incorporating what it believed to be the working arrangements between the parties. The letter provided that "all MMI time will be billed by MMI at a rate of

$40/hour for software, $50/hour for engineering, and $75/hour for supervision .... Direct expenses will be billed as charged MMI." The letter also provided that MMI was to receive a fifteen percent incentive bonus if it completed the project on an accelerated schedule. The letter further provided that Gregory must give MMI a two-week project termination notice for termination to be effective. The letter ended: "If the terms of this letter meet with your understanding, please sign and return a copy to me no later than October 25, 1982."

On October 25, 1982, Coleman signed the letter, acknowledging receipt of the letter and confirming that the items in the letter had been discussed and agreed upon. During the next two months, the parties agreed to a number of amendments to the agreement. Gregory confirmed all of these changes with Oilgear. In January of 1983, Coleman and MMI agreed that the software was to be completed and ready for final testing by February 1, 1983 for MMI to earn the bonus.

On February 1, the parties from MMI (Sally Peterson, president of MMI, and Mike Christie) were not available. Gregory took the software from MMI but complained that it had not been completed to his satisfaction. However, Gregory did not permit MMI to correct any of the alleged defects in the software, and never communicated any specific objections to MMI regarding the software until legal action began.

Pursuant to the parties' stipulation, the trial court ordered the trial bifurcated because of the complexity of the issues. This was because many of Gregory's counterclaims against MMI would apply only if the parties' contract were one mainly for goods,

and thus subject to U.C.C. strictures.[1] In the first phase, the issue would be whether the contract was governed by the U.C.C., i.e., whether the contract was mainly for services or mainly for goods. Because Gregory's defenses of modification of the contract and failure of consideration would apply even if the contract were mainly for services, the trial court would consider evidence relevant to those issues in the first phase. Only if the trial court determined that the contract was for goods would a second trial be held.

After the first phase, the trial court concluded that the October 22 letter was the contract, that it was mainly for services rather than goods, and that therefore the U.C.C. did not apply. The court also concluded that, although the parties had modified the original contract, this had no effect on Gregory's liability to compensate MMI for all services performed. In addition, the trial court concluded that there was no failure of consideration. This was because the parties' mutual promises, i.e., MMI's promise to use its expertise and skill in the design and development of the controller software and Gregory's promise to pay for these services, were sufficient consideration for each other. The court further concluded that MMI had made no express or implied warranty that the end product of the services agreement would meet certain specifications. The court granted MMI judgment against Gregory for $24,503.68, which represented MMI's unpaid invoices to Gregory plus interest to date of judgment minus the fifteen percent bonus, which MMI had waived.

[1]Gregory counterclaimed for breach of implied warranty of fitness for a particular purpose pursuant to sec. 2–315 of the U.C.C. [sec. 402.315, Stats.] Section 402.102 provides that ch. 402 applies only to transactions in goods.

## CONTRACT FOR GOODS OR SERVICES?

■ Although at trial Gregory contested MMI's claim that the October 22, 1982 letter was the parties' contract, he does not argue on appeal that the trial court's conclusion is erroneous. The interpretation of an unambiguous contract presents a question of law which we review de novo. *Schmitz v. Grudzinski,* 141 Wis. 2d 867, 871, 416 N.W.2d 639, 641 (Ct. App. 1987). It is undisputed that this was a mixed contract, i.e., a contract for both goods and services. *Van Sistine v. Tollard,* 95 Wis. 2d 678, 684, 291 N.W.2d 636, 639 (Ct. App. 1980). The issue is whether the mixed contract was predominantly for goods or for services.

> The test for inclusion or exclusion [within the U.C.C.] is not whether [contracts] are mixed, but, granting that they are mixed, whether their predominant factor, their thrust, their purpose, reasonably stated, is the rendition of service, with goods incidentally involved (e.g., contract with artist for painting) or is a transaction of sale, with labor incidentally involved (e.g., installation of a water heater in a bathroom).

*Bonebrake v. Cox,* 499 F.2d 951, 960 (8th Cir. 1974) (footnotes omitted), *quoted in Van Sistine,* 95 Wis. 2d at 684, 291 N.W.2d at 639.

Gregory cites many cases which he alleges support construing the contract as one primarily for goods. Nevertheless, we conclude that *Data Processing v. L. H. Smith Oil Corp.,* 492 N.E.2d 314 (Ind. App.), *aff'd on rehearing,* 493 N.E.2d 1272 (Ind. App. 1986) is on point and more compelling. In that case, as here, the parties contracted for custom computer program-

ming. *Id.* at 316. The trial court had reasoned that the contract was for the development and delivery of a "program," which it concluded was a specially manufactured good covered by U.C.C. warranty provisions. *Id.* at 317. The appellate court phrased the issue as "whether a contract to provide computer programming is a contract for the sale and purchase of goods and thus subject to the provisions of article 2 of the UCC, or one for the performance of services, and thus subject to common law principles." *Id.* at 318. The court noted that "DPS was *to act* with specific regard to Smith's need. Smith bargained for DPS's skill in developing a system to meet its specific needs." *Id.* (Emphasis in original.) The court concluded the contract was for services, and not subject to U.C.C. warranty provisions. The court held that the "mere means by which DPS's skills and knowledge were to be transmitted to Smith's computers was incidental." *Id.* at 319. *Accord Liberty Fin. Mgmt. v. Beneficial Data,* 670 S.W.2d 40, 48–49 (Mo. App. 1984).

In the present case, the contract provided that all MMI charges to Gregory would be on the basis of time, at stated rates, and materials. Under *Bonebrake,* we must determine whether the contract's predominant factor, thrust and purpose is the rendition of a service or the transaction of a sale. 499 F.2d at 960. As we did in *Van Sistine,* we may look to evidence of billing to determine this issue. 95 Wis. 2d at 685, 291 N.W.2d at 639. On January 18, 1983, Terry Coleman, an agent for Gregory, wrote the following in a letter to Sally Peterson, president of MMI: "3. The projected total, excluding bonus, is therefore approximately $59,828, of which $55,968 is labor." In addition, we may look to the language of the contract to determine whether it is more in accord with services instead of sales. *Id.* The

contract speaks in terms of "man-days," "development," "time," "design," etc. These words connote the rendition of services and not a sales transaction.

█

Based on this evidence, we conclude that this was primarily a service contract. The method by which MMI transmitted that service was merely incidental. Therefore the transaction is not subject to the provisions of the U.C.C.[2]

---

[2]Gregory cites cases which he alleges compel the opposite result. These cases are distinguishable. In *Triangle Underwriters, Inc. v. Honeywell, Inc.,* 457 F. Supp. 765, 767 (E.D.N.Y. 1978), *modified,* 604 F.2d 737 (2d Cir. 1979), the contract involved the sale of a computer system, including hardware. In *Austin's of Monroe, Inc. v. Brown,* 474 So. 2d 1383 (La. App. 1985), the contract involved the furnishing of computer hardware, software and programming, but the charges for "software and training" represented only "about ⅕ of the total cost of the system." *Id.* at 1388. In *RRX Industries, Inc. v. Lab-Con, Inc.,* 772 F.2d 543, 545 (9th Cir. 1985), the parties contracted for the sale of a computer software system. It is not clear from the opinion whether the parties had contracted for the sale of an existing computer software system or for the development of a custom computer software system. The court noted that "[b]ecause software packages vary depending on the needs of the individual consumer, we apply a case-by-case analysis." *Id.* at 546. The court did not elaborate.

In *Schroders, Inc. v. Hogan Systems, Inc.,* 522 N.Y.S.2d 404 (Sup. 1987), the contract at issue involved the sale of "a fully developed [software] system." *Id.* at 405. It did not involve the initial development of a software system. In *Neilson Bus. Equip Ctr. v. Monteleone,* 524 A.2d 1172 (Del. 1987), at issue was a lease contract for "computer hardware, software and related services." *Id.* at 1173. However, the defendant did not design the software, but merely altered it. *Id.* The court also noted that the defendant had agreed to supply a "turn-key computer system," and it concluded that the trial court's conclusion that the computer system was predominantly goods was supported by substantial

## WARRANTIES

On January 3, 1985, MMI served Gregory with requests for admissions. One of these provided "as a matter of law, if the contract between the plaintiff and the defendants was for services rather than goods, there were no express warranties whatsoever made to the defendants in connection with the provision of those services to the defendants by the plaintiff." Gregory did not respond for more than seven months.

If a party does not submit an answer to a request for an admission within thirty days of service, the matter is admitted. Sec. 804.11(1)(b), Stats. A party may seek admissions which are dispositive of the case or which relate to "ultimate facts." *Schmid v. Olsen,*

evidence. *Id.* at 1174. *Jay V. Zimmerman Company v. General Mills, Inc.,* 327 F. Supp. 1198 (E.D. Mo. 1971) did not involve the issue of whether a contract was for goods or services under the U.C.C. In *National Civil Service League v. City of Santa Fe, N.M.,* 370 F. Supp. 1128, 1131 (D.N.M. 1973), the court merely noted that it was "conceivable" that a service contract could be construed as a transaction in goods, and thus subject to the U.C.C. In *Texsun Feed Yards, Inc. v. Ralston Purina Company,* 447 F.2d 660, 667–68 (5th Cir. 1971), the defendant's business was selling supplements to feedlot operators, with consulting services provided to increase sales. In *Aluminum Company of America v. Electro Flo Corp.,* 451 F.2d 1115, 1118 (10th Cir. 1971), the defendant did not order and was not billed for engineering services, and plaintiff's full charge was for materials only. Note, *Computer Programs as Goods under the U.C.C.,* 77 Mich. L. Rev. 1149, 1162 (1979) provides: "When a supplier of services also supplies incidental materials or consumes materials while performing the services, courts traditionally hold that the entire agreement is a service contract." (Footnote omitted.) In the present case, there was unrebutted testimony by MMI's president that MMI was solely a supplier of services during the period of its contract with Gregory.

111 Wis. 2d 228, 236, 330 N.W.2d 547, 551 (1983). A matter admitted is conclusively established unless the court permits withdrawal. Sec. 804.11(2). A court may permit withdrawal if withdrawal would further the presentation of the merits of the controversy and if the party who obtains the admission fails to satisfy the court that withdrawal will prejudice the party in maintaining the action or defense on the merits. Sec. 804.11(2). The decision is discretionary. *Schmid,* 111 Wis. 2d at 237, 330 N.W.2d at 551. Because Gregory did not timely respond, the trial court concluded the matter was admitted. On appeal, Gregory does not claim the trial court abused its discretion. Therefore the issue of express warranty is not before us, and we address only the issues of whether there was an implied warranty in fact or law.

> A "warranty" is an assurance by one party to a contract of the existence of a fact upon which the other party may rely. It is intended to relieve the promisee of any duty to ascertain the fact for himself, and amounts to a promise to indemnify the promisee for any loss if the fact warranted proves untrue.

17A C.J.S. *Contracts* sec. 342, p. 325 (1963) (footnotes omitted), *quoted in Dittman v. Nagel,* 43 Wis. 2d 155, 160, 168 N.W.2d 190, 193 (1969).

The trial court held there was no implied warranty in fact. We uphold a trial court's factfindings if, upon a review of the record, they are not clearly erroneous. *In re Marriage of Harris v. Harris,* 141 Wis. 2d 569, 573, 415 N.W.2d 586, 588 (Ct. App. 1987). The party relying upon a breach of warranty has the burden of proof to show the warranty. *Dittman,* 43

Wis. 2d at 165, 168 N.W.2d at 196. The trier of fact determines the weight of evidence and the credibility of witnesses. *State v. Wyss,* 124 Wis. 2d 681, 694, 370 N.W.2d 745, 751 (1985).

■

The trial court concluded that the evidence did not support a finding that an implied warranty existed. Peterson testified that MMI's policy was to give clients what they expected, but that results were never guaranteed. She also testified that she told Gregory that the software project was of an experimental nature. The trial court believed Peterson, and found there was no implied warranty in fact. We affirm that finding because it is not clearly erroneous. *Harris,* 141 Wis. 2d at 573, 415 N.W.2d at 588.

■

The next issue is whether there is an implied warranty in law. This is a legal question which we review de novo. *State v. Newago,* 134 Wis. 2d 420, 426, 397 N.W.2d 107, 110 (Ct. App. 1986). In *Hoven v. Kelble,* 79 Wis. 2d 444, 461–63, 256 N.W.2d 379, 388 (1977), the supreme court addressed this issue:

> A number of decisions in other jurisdictions have allowed recovery on the basis of strict liability (or the closely related doctrine of implied warranty) where the injury was due to a defective product supplied or used in the course of rendering a service to plaintiff. Several cases have allowed recovery on the basis of strict liability or implied warranty where "defective services" have been rendered, but these services have been of a relatively routine or simple nature. Where "professional" services are in issue the cases uniformly require that negligence be shown. (Footnotes omitted.)

"If the activity of [the defendant] pursuant to its contract ... be viewed as the rendering of professional services, then no matter how the basis of liability is described it amounts to no more than a claim of negligence in failing to perform these services with due care." *La Rossa v. Scientific Design Company,* 402 F.2d 937, 943 (3rd Cir. 1968) (upholding trial court's dismissal of claim of breach of implied warranty), *cited in Hoven,* 79 Wis. 2d at 463 n.12, 256 N.W.2d at 388. Gregory has not cited any case law holding that we should now recognize the existence of an implied warranty as a matter of law where professional services are rendered. We do not consider arguments without authority. *State v. Shaffer,* 96 Wis. 2d 531, 545–46, 292 N.W.2d 370, 378 (Ct. App. 1980). Therefore we affirm the trial court on this issue.

## *EFFECT OF SCHEDULING ORDER*

Gregory next contends that even if the contract was not subject to the U.C.C., the second phase of the bifurcated trial must be held to determine whether MMI substantially performed its contractual obligations. Gregory claims that MMI has to prove that the results of the endeavor were beneficial to him. Gregory also asserts that the scheduling order expressly reserved for the second phase of the trial the determination of the "merits and content of the work product." MMI points out that the parties stipulated to the scheduling order, which provided that the second phase of the trial would be held only if after phase one the trial court determined that the contract was mainly for goods rather than services. Since the trial court concluded the contract was mainly for services

513

rather than for goods, MMI continues, no second phase is necessary.

The stipulation to the scheduling order limiting the issues for trial is binding on the parties and the court. *Hansen v. Oregon,* 11 Wis. 2d 399, 401, 105 N.W.2d 815, 816 (1960). The scheduling order divided the trial into two phases, the second phase to be held only if the court concluded the contract was mainly for goods. We have upheld the trial court's conclusion that the contract was mainly for services rather than for goods. Gregory is bound by his stipulation.

Gregory moved for reconsideration of the trial court's decision, requesting relief pursuant to sec. 806.07(1)(a) and (h), Stats., which allows a court to relieve a party from a judgment or stipulation because of mistake, surprise, or other justifiable reasons. Gregory's attorney claimed that the trial court had modified the scheduling order by removing the affirmative defense of failure of consideration from phase one of the trial to phase two. The trial court had handwritten the following phrase in its notes taken at the June 30, 1986 pretrial conference: "ques. of what was K." Gregory's attorney claimed this note modified the scheduling order. Because of this alleged modification, Gregory's attorney claimed he was misled and therefore presented no evidence in support of the affirmative defense of failure of consideration. The trial court denied Gregory's motion for reconsideration.

Section 806.07(1), Stats., provides in part:

On motion and upon such terms as are just, the court may relieve a party or legal representa-

tive from a judgment, order or stipulation for the following reasons:

(a) Mistake, inadvertence, surprise, or excusable neglect;

. . . .

(h) Any other reasons justifying relief from the operation of the judgment.

■

Whether to grant relief under sec. 806.07, Stats., is within a trial court's discretion, and we will not reverse for an abuse of discretion if the record shows that the trial court exercised its discretion and that there is a reasonable basis for the trial court's decision. *Marriage of Mathewson v. Mathewson,* 135 Wis. 2d 411, 416, 400 N.W.2d 485, 487 (Ct. App. 1986).

■

The trial court noted that Gregory's argument that the court had modified the scheduling order was based on one line, "Ques. of what was K," from the minutes taken by the judge during the pretrial conference two weeks before trial. The judge rejected this argument as contrary to the record and common sense. The trial court pointed out that the scheduling order was very specific in outlining which issues would be presented at which phase, and that it was unlikely that one short notation was meant to change the scheduling order. The trial court explained that in this "carefully documented" case, "[s]o radical a change in the content of a two-day hearing set two weeks away most assuredly would have been memorialized by more than a five-word handwritten, abbreviated notation that is consistent with what actually transpired at the hearing." We conclude there was no abuse of discretion.

## SUBSTANTIAL PERFORMANCE

Gregory claims the issue of substantial performance still has to be tried. In its complaint, MMI claimed it had "performed for the defendants all the services requested by the defendants." In his answer, Gregory alleged that "the software developed by the Plaintiff did not substantially meet or conform with the specifications mutually agreed upon ... in violation of the agreement between the parties," and that therefore "the consideration for the agreement between the parties totally failed." The trial court concluded that substantial performance had been tried in the first phase of the trial.

The test for substantial performance is whether the performance meets the essential purpose of the contract. *Plante v. Jacobs,* 10 Wis. 2d 567, 570, 103 N.W.2d 296, 298 (1960). The trial court concluded that MMI had promised to use its expertise and skill in designing and developing software, and that Gregory had promised to pay MMI for this service. Because the trial court found that MMI did use its expertise and skill, the court held that Gregory had received what he had bargained for. The trial court ruled against Gregory on the issue of failure of consideration, i.e., that MMI did not perform what it promised, by finding that MMI did perform its promise to use its skill and expertise. This finding subsumes the finding that MMI substantially performed its contract since it provided Gregory what he bargained for. No new trial was needed, since the issue had been disposed of.

Gregory alleges that the trial court's conclusion that the issue of substantial performance need not be tried was based solely on its findings that Gregory had

accepted the software without complaint and received the benefit of it. Gregory claims that the scheduling order reserved the issue of acceptance and benefit for phase two of the trial, and that Gregory offered little if any evidence on these issues in phase one.

We need not address this claim of error. Even if the trial court's reasoning is erroneous, we may still affirm if the result if correct. *State v. Alles,* 106 Wis. 2d 368, 391, 316 N.W.2d 378, 388 (1982). Gregory claims that the software was virtually useless and that Gregory received no benefit from it. However, this argument goes to the quality of the work product, and not to whether MMI used its expertise and skill to develop it. Such an inquiry would be relevant if this were a contract for goods under the U.C.C., but since it is not, no such inquiry is required. Gregory does not contest the trial court's finding that MMI "used its skill and expertise in good faith and integrity to design and develop the software" and that MMI "exercised the degree of diligence and skill" which Gregory contracted for. Since MMI provided what it promised, it substantially complied with the contract. Whether Gregory accepted the end product or whether he received any benefit from the end product does not alter the fact of MMI's substantial performance of the contract.

## AMENDMENT TO COUNTERCLAIM

Gregory claims the trial court abused its discretion when it denied him leave to amend his counterclaim to add an additional count of "negligence in breaching the agreement between the parties." Grego-

ry made this motion almost two years after the filing of the summons and complaint. Section 802.09(1), Stats., allows a party to amend pleadings once as a matter of course within six months of the filing of the summons and complaint, and at other times only by leave of court or by written consent of the adverse party. Whether to grant leave to amend after six months under sec. 802.09(1) is left to the trial court's discretion. *State v. Peterson,* 104 Wis. 2d 616, 634, 312 N.W.2d 784, 793 (1981). Even if the trial court erred, the error was harmless because MMI did not breach the contract. We do not reverse for harmless error, since it does not affect the result of the trial. *Helmbrecht v. St. Paul Ins. Co.,* 122 Wis. 2d 94, 131, 362 N.W.2d 118, 137 (1985).

*By the Court.*—Judgment affirmed.