NEILSON BUSINESS EQUIPMENT CENTER, INC., a Delaware Corporation, Defendant Below, Appellant,

v.

ITALO V. MONTELEONE, M.D., P.A., A Delaware Professional Association, Plaintiff Below, Appellee.

Supreme Court of Delaware.

Submitted: Feb. 18, 1987.
Decided: April 23, 1987.

George H. Seitz, III (argued), and Gregory Gaglione, Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, for appellant.

James W. Owen (argued) and Philip Buckle Obbard, Williams, Gordon & Martin, P.A., Wilmington, for appellee.

Before CHRISTIE, C.J., MOORE and HOLLAND, JJ.

MOORE, Justice.

Following a nonjury trial in the Superior Court, defendant Neilson Business Equipment Center, Inc. (Neilson), appeals a judgment awarding plaintiff, Dr. Italo V. Monteleone, P.A., damages of $34,983.42 for breaches of the warranties of merchantability and fitness arising from a lease contract for computer hardware, software and related services. The trial court found that the objects of the lease constituted "goods" under the Uniform Commercial Code [1] and granted relief under the Code's implied warranties of merchantability and fitness. 6 *Del.C.* §§ 2–314(1) and 2–315.

Neilson's primary contentions are that the trial court erred (1) in classifying the computer software and related technical services as goods, and (2) in applying the Uniform Commercial Code's warranties to this transaction. Thus, we address for the first time the issue of computer software (programs) being treated as "goods" under the Code.

Both parties concede error in the computation of damages. We find that the classification of the contract as one involving "goods" is supported by substantial evidence. Accordingly, we affirm the judgment relating to breaches of the implied warranties of merchantability and fitness, but reverse and remand for a recomputation of damages.

**I.**

Dr. Monteleone is a neurologist. In March, 1982, his office began investigating various computer information systems, since record keeping was entirely manual. The doctor gave Toni Reed, his bookkeeper and office manager, complete authority to acquire a suitable computer system. However, Ms. Reed had no prior experience in buying computer technology.

She initially considered four possible computer dealers, including Neilson. An advertisement in the local telephone directory listed Neilson as a dealer in microcomputers. Ultimately, Ms. Reed chose Neilson, in part because she had previously purchased an office photocopier from the defendant with satisfactory results.

After an initial meeting at Neilson's office, the company sent two representatives to study Dr. Monteleone's manual billing system. The parties ultimately signed a lease/purchase option agreement covering hardware equipment and software. As part of the agreement, Neilson agreed to customize the computer system to meet Dr. Monteleone's needs. The purchase price was $18,995, but Dr. Monteleone chose to lease the equipment in order to obtain favorable cash flow and tax benefits. The total of all lease payments amounted to $32,800.80. Dr. Monteleone retained an option to purchase the system at the end of the lease at fair market value, not exceeding 10% of the original purchase price. In addition to the lease, the parties executed a separate maintenance agreement valued at $2,182.00. To facilitate the transaction, Neilson sold the equipment and software to Tri-Continental Leasing Corporation, who in turn leased the items to Dr. Monteleone.

Although Neilson did not design the software, it renamed the program it had acquired elsewhere the "Neilson Medical Office Management System." However, Neilson did alter the program at various times in an attempt to make it meet the doctor's needs.

---

1. 6 *Del.C.* §§ 1–101 *et seq.*

The computer was delivered in July, 1982, and problems immediately developed. For example, the system printed a separate bill for each treatment rather than one bill encompassing the doctor's services to a patient for a specific period; the bills and medical insurance forms were not compatible with Dr. Monteleone's records; patient information was not as detailed as required; and incorrect balances appeared in the accounts receivable register. Attempts to modify the system failed, and in August, 1982, Neilson hired a program consultant to solve the problems.

In February, 1983, Dr. Monteleone notified Neilson that the lease was terminated for cause. Thereafter, plaintiff stopped using the computer, although in March, 1983, Neilson's program consultant successfully effected some modifications. In June, 1983, Neilson took possession of the system pursuant to an agreement which allowed Neilson to try and resell it. While in possession of the computer, Neilson modified the billing program and returned the system to Dr. Monteleone's office. The doctor never used the machine after its return, but continued timely lease payments under the contract.

The Superior Court ruled that the transaction involved goods and applied the warranty provisions of the Uniform Commercial Code. The trial court found that Neilson had breached the implied warranties of merchantability and fitness for a particular purpose, and awarded Dr. Monteleone damages totaling $34,983.42, with interest from March 11, 1983.

## II.

█ This Court's standard and scope of review of the trial court's factual findings is governed by *Levitt v. Bouvier,* Del. Supr., 287 A.2d 671 (1972). Accordingly, those determinations will not be disturbed if they are supported by the record and are the product of an orderly and logical deductive process. *Id.* at 673.

The central issue before us is whether a contract for a computer system consisting of computer hardware, software and services constitutes "goods" under the Uniform Commercial Code. In our opinion, the parties agreed to a lease/purchase of a turnkey computer system which may properly be classified as a package constituting goods.

█ Article Two of the Uniform Commercial Code applies to "transactions in goods." 6 *Del.C.* § 2–102.[2] The contract between Dr. Monteleone and Neilson is a mixed contract for both goods and services. When a mixed contract is presented, it is necessary for a court to review the factual circumstances surrounding the negotiation, formation and contemplated performance of the contract to determine whether the contract is predominantly or primarily a contract for the sale of goods. If so, the provisions of Article Two of the Uniform Commercial Code apply. *Glover School and Office Equip. Co., Inc. v. Dave Hall, Inc.,* Del.Super., 372 A.2d 221, 223 (1977).

Neilson urges us to separate the contract into three distinct subparts—hardware, software and services. Defendant contends that only the hardware can be classified as "goods" under the Code, that there was nothing defective about the hardware, and thus plaintiff's claims for breaches of implied warranties fail. Neilson further argues that software is an intangible, and that intangibles do not constitute "goods" subject to the Code.

█ That argument is innovative, but unpersuasive. Neilson contracted to supply a turn-key computer system; that is, a system sold as a package which is ready to function immediately. The hardware and software elements are combined into a single unit—the computer system—prior to sale. The trial court's factual conclusion that the computer system is predominantly "goods" is supported by substantial evidence. Dr. Monteleone did not intend to contract separately for hardware and software. Rather, he bought a computer sys-

---

**2.** 6 *Del.C.* § 2–102 provides, in pertinent part: "Unless the context otherwise requires, this Arti-

cle applies to transactions in goods ..."

tem to meet his information processing needs. Any consulting services rendered by Neilson were ancillary to the contract, and cannot reasonably be treated as standing separately to escape the implied warranties of the Uniform Commercial Code.[3]

Here, the parties cast their agreement in terms of a lease with an option granted Dr. Monteleone to purchase the computer system later. Although structured as a lease, it is clear that the parties intended to enter into the equivalent of a purchase and sale. Dr. Monteleone decided to lease because of favorable cash flow and tax benefits. Though structured as a lease, the substance of the transaction was a sale, and the trial court properly characterized it as such. *Earman Oil Co., Inc. v. Burroughs Corp.*, 625 F.2d 1291, 1293 n. 5 (5th Cir. 1980).

▌ Every contract of sale entered into by a merchant includes an implied warranty that the goods sold be "merchantable."[4] The computer system, to be merchantable, must have been capable of passing without objection in the trade under the contract description, and be fit for the ordinary purposes for which it was intended. 6 *Del.C.* § 2–314(1) and (2).[5] There is no dispute that the computer system failed in that

regard. In general, the computer system did not meet Dr. Monteleone's expressed record and bookkeeping needs, even though Neilson's sales representatives informed Ms. Reed that the system would do so. The trial court correctly found that plaintiff had established all the elements necessary to prove a breach of the warranty of merchantability, namely: (1) that a merchant sold the goods; (2) that such goods were not "merchantable" at the time of sale; (3) that plaintiff was damaged; (4) that the damage was caused by the breach of the warranty of merchantability; and (5) that the seller had notice of the damage. *See F.E. Meyers Co. v. Pipe Maintenance Servs., Inc.*, 599 F.Supp. 697, 703 (D.Del. 1984).

An implied warranty of fitness for a particular purpose arises when a seller, at the time of contracting, has reason to know a particular purpose of the buyer's for which the goods are required, and has reason to know that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods. 6 *Del.C.* § 2–315.[6] The buyer need not provide the seller with actual knowledge of the particular purpose for which the goods are intended or of his reliance on the seller's skill and judgment,

---

**3.** *Accord Aplications, Inc. v. Hewlitt-Packard Co.*, 501 F.Supp. 129, 133 (S.D.N.Y.1980), *aff'd*, 672 F.2d 1076 (2d Cir.1982); *Chatlos Systems, Inc. v. National Cash Register Corp.*, 479 F.Supp. 738, 742 (D.N.J.1979), *aff'd and remanded*, 635 F.2d 1081 (3d Cir.1980); *Triangle Underwriters, Inc. v. Honeywell, Inc.*, 457 F.Supp. 765, 769 (E.D.N.Y.1978), *aff'd in part, rev'd in part*, 604 F.2d 737 (2d Cir.1979); *Investors Premium Corp. v. Burroughs Corp.*, 389 F.Supp. 39, 44–45 (D.S.C. 1974); *Kalil Bottling Co. v. Burroughs Corp.*, Ariz.Ct.App., 127 Ariz. 278, 619 P.2d 1055, 1058 (1980); *Acme Pump Co., Inc. v. National Cash Register Co.*, Conn.Com.Pl., 32 Conn.Supp. 69, 337 A.2d 672, 675 (1974); *Atlas Ind., Inc. v. National Cash Register Co.*, Kans.Sup., 216 Kan. 213, 531 P.2d 41, 45–48 (1975).

**4.** A merchant is one who regularly deals in goods of the kind involved or otherwise has a professional status with regard to the goods involved such that he or she could be expected to have specialized knowledge or skill peculiar to those goods. 6 *Del.C.* § 2–104(1). *See Cropper v. Rego Distribution Center, Inc.*, 542 F.Supp. 1142, 1153–54 (D.Del.1982). Although Neilson did not manufacture the computer equipment involved here, it clearly held itself out as having

the professional status with regard to computers and computer systems necessary to elevate it to the status of a merchant.

**5.** 6 *Del.C.* § 2–314 provides, in pertinent part:
(1) Unless excluded or modified ... a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind ...
(2) Goods to be merchantable must be at least such as
(a) pass without objection in the trade under the contract description; and
\* \* \* \* \* \*
(c) are fit for the ordinary purposes for which such goods are used ...

**6.** 6 *Del.C.* § 2–315 provides:
Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose.

if the circumstances are such that the seller has reason to perceive the purpose intended or that reliance exists. *See* J. White and R. Summers, *Uniform Commercial Code*, Section 9–9 (2d ed. 1980).

Here, Neilson knew that Dr. Monteleone, through his assistant, Ms. Reed, sought a computer system to meet specific information processing needs. Neilson admits that it was responsible for selecting the proper equipment, and also agreed to customize the software so that the computer system would be compatible with Dr. Monteleone's manual records. There could hardly be a clearer case where a buyer relies on the professional expertise of the seller than that presented here. Dr. Monteleone needed a system that would perform specific functions, and relied on Neilson's professional expertise and experience in the computer and information processing field to develop and deliver a satisfactory computer system. Neilson clearly had reason to know of Monteleone's reliance on the company's expertise and breached the warranty of fitness for a particular purpose. Its liability is established under the Uniform Commercial Code.

### III.

 We turn to the damages question. The trial court awarded Dr. Monteleone all lease payments, $32,800.80, plus the value of the maintenance contract, $2,182.62, for a total of $34,983.42, with interest from March 11, 1983. The measure of recovery for a breach of the warranties of merchantability and fitness for a particular purpose is as provided by 6 *Del.C.* § 2–714(2):

> The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.

The trial court failed to consider Section 2–714(2) when computing damages, and thus erred in its calculation of the award.

Under section 2–714(2) the contract price is the starting point for damages, but that may vary if "special circumstances" exist. Since this lease obligated Dr. Monteleone to pay in installments, this might constitute a special circumstance warranting a different approach. Thus, we accept the trial judge's use of the lease payment plan as a starting point. However, the award must still be modified since it grants interest on the total lease payment of $32,800.80 from 1983, when in fact many payments did not become due until a time well after 1983. On remand, the trial court should more fully detail the damage award giving due consideration to Section 2–714(2).

Accordingly, we affirm the Superior Court's finding that Neilson breached the Uniform Commercial Code warranties of merchantability and fitness, but reverse as to the damage award and remand for a recalculation under 6 *Del.C.* § 2–714(2).